ZANNOTH *v.* BOOTH RADIO STATIONS, INC.

1. CONTRACTS—ARCHITECTS—COMPENSATION—PRELIMINARY   WORK—
    OFFSET.

    Amount paid plaintiff architect at hourly rate for certain pre-
       liminary work he had done before entering into contract
       for erection of 2 radio stations wherein the hourly rate for
       such work was set forth as well as the architect's percentage
       for specified services would not be offset against total fees
       for building, where contract specifically provided method of
       payment under the standard form of architect's contract.

2. SAME—COST OF CONSTRUCTION.

    An architect must stay within the cost of construction set by
       the owner, even though such cost was not set out in the
       written contract between the parties relative to services
       to be rendered by the architect.

3. WORK AND LABOR—QUANTUM MERUIT—BENEFITS.

    Recovery cannot be had on a *quantum meruit* by a person who
       breached the contract against one receiving no benefit from
       the performance of the services for which recovery is sought.

4. CONTRACTS — ARCHITECTS — COST OF CONSTRUCTION — WAIVER —
    QUANTUM MERUIT.

    Architect who proceeded with plans for a building costing al-
       most 50% more than the cost originally contemplated and
       nearly 3 times amount of first cost limitation was not en-
       titled to recover on *quantum meruit* for services rendered
       subsequent to first cost limitation, where such limitation
       was not subsequently waived and owner received no benefit
       from architect's services.

REFERENCES FOR POINTS IN HEADNOTES
[1–9]  3 Am Jur, Architects §§ 11, 12.
[1–9]  Compensation of architect or engineer as affected by in-
    ability to carry out plans or specifications at amount satis-
    factory to employer.  127 ALR 410.
[3]  58 Am Jur, Work and Labor §§ 41–43.
[10]  14 Am Jur, Costs § 92.

5. Same—Duty of Architects to Disclose Cost of Construction.
An architect has an affirmative duty to give the owner some idea of the final cost of a construction project, regardless of whether the owner should have known of its possible cost or not, where testimony shows that cost was an important factor all during the planning of the project, the standard form of contract for architect's services not absolving the architect from duty of disclosure under the circumstances that building as being designed would cost nearly 3 times amount of first cost limitation set by owner.

6. Principal and Agent—Architects—Disclosure.
An architect who has been employed to furnish plans and superintend construction for an owner is an agent who has the duty to act in good faith and loyally and make full disclosure of all matters, of which he has knowledge, which it is desirable or important that his principal should learn.

7. Same—Architects—Compensation—Plans for Building Exceeding Cost Limitations.
An architect is not entitled to compensation where building he planned cannot be erected for stipulated amount and he is employed to prepare plans for a building to cost not more than a certain sum.

8. Same—Architects—Breach of Duty as to Disclosure.
An architect breached his duty where he failed to make full disclosure, even if the owner had waived a cost limitation he had set for studio building, and proceeded to draw plans for building which he knew far exceeded the owner's ability and willingness to pay for and which he knew was not even within the owner's contemplation to erect; hence he was properly denied recovery for such services.

9. Contracts — Architects — Performance — Compensation— Evidence.
Plans for a small radio transmitter building, drawn by plaintiff architect under direct orders from defendant owner and which were substantially completed as contemplated, entitled plaintiff to contract percentage of estimated cost of construction, where there was no testimony plaintiff was hired on an hourly basis, it being immaterial that building actually constructed from a different set of plans after plaintiff's contract was terminated cost somewhat less.

10. COSTS—FAILURE OF EITHER PARTY TO PREVAIL IN FULL.
    No costs are allowed on appeal in architect's action for services
    rendered in connection with plans he had made for buildings
    for housing 4 radio stations, where both parties appealed and
    judgment rendered by trial court was affirmed, since neither
    party has fully prevailed.

Appeal from Wayne; Murphy (Thomas J.), J. Submitted January 11, 1952. (Docket No. 41, Calendar No. 45,260.) Decided April 7, 1952.

Action by George G. Zannoth against Booth Radio Stations, Inc., a Michigan corporation, for architect's fees. Judgment for plaintiff on directed verdict. Plaintiff appeals claiming an insufficient amount. Defendant cross-appeals. Affirmed.

*Leithauser, Leithauser & Tobias,* for plaintiff.

*Voorhies, Long, Ryan & McNair,* for defendant.

BUTZEL, J. Plaintiff, George G. Zannoth, an architect, sought recovery in 1 suit for architectural services rendered during 1946 and 1947 for Booth Radio Stations, Inc., defendant, for 4 different building jobs, 2 in Flint, Michigan, and 2 in Highland Park, Michigan. They will be discussed separately where different problems are involved.

The 2 buildings in Flint were completed. Those in Highland Park were to consist of a small transmitter station, and also a large building on Midland avenue for a studio and transmitter station. The latter building was never built and defendant contends that plaintiff has failed to prove any liability, even on a *quantum meruit* count, for any services rendered in planning this building. Defendant agrees that there is still an amount due plaintiff for services rendered for the 2 Flint buildings, but plaintiff disputes defendant's claim that certain credits should be allowed as setoffs. There is also a

dispute in regard to the charges for plans for the small transmitter station in Highland Park.

At the end of the trial, after both sides had rested, the trial judge decided that the case presented no questions of fact, but only those of law, and directed a verdict in the full amount claimed by plaintiff for work on the 2 buildings in Flint and plans for the small station in Highland Park, amounting in the aggregate to $7,284.48 and $50 costs; at the same time directing a verdict of no cause of action in favor of defendant on plaintiff's claim for architectural fees for the large Highland Park building.

Plaintiff appeals from the disallowance of his claim for services for the contemplated large Highland Park building, and defendant cross-appeals from amounts allowed plaintiff for the other 3 buildings. The case is appealed on 1 record which contains the testimony in regard to the various claims.

*Flint jobs.* The parties contracted for the construction of a radio transmitter building on Bristol road in Flint on December 17, 1946. The contract provided as follows:

"The owner agrees to pay the architect for such services a fee of 6% of the cost of the work.  *  *  *  Charges for previous preliminary work submitted before Dec. 17, are at the rate of $6 per hour, as set forth in letter of November 30, 1946.  *  *  *

"1. The architect's services.—The architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings; the drafting of forms of proposals and contracts."

Another contract for remodeling a store at 112 W. Water in Flint for radio broadcasting studio and offices was signed on February 17, 1947, and contains similar provisions except that 8% of the cost of the work was to be the base rate.

In each case, it appears that plaintiff did some work consisting of drawing sketches, plans and specifications, as well as participating in certain conferences, before the contracts were signed. All of the work before the dates of such contracts was billed and paid for at the rate of $6 an hour by defendant. The cost of the buildings and the percentage thereof to which plaintiff is entitled was agreed to by the parties. The only dispute appears to be whether or not defendant is entitled to offset the payments made for work done prior to entering into the written contracts against plaintiff's stipulated fees under the contracts. The trial court denied the offset.

There was no error. Ordinarily under the standard architect's contract, the base rate, as is specified by the parties, would include all of the work done by the architect, as nothing therein is said about 2 kinds of preliminary work; but the instant contracts clearly state that *previous* preliminary work will be paid for at the rate of $6 an hour. Defendants contend that the hourly provision was simply a method of devising payments from time to time to apply on the fees for the completed building. However, there would be no reason for adding a provision for such payments as the method of payment under the contract is already covered by the standard form of architect's contract. Judgment denying defendant the right to offset payments and holding in favor of plaintiff for the amounts claimed by plaintiff and as found by the trial court is affirmed.

*Highland Park studio and transmitter building.* Plaintiff first was contacted by defendant relative to building a broadcasting studio and transmitter building on Midland avenue in Highland Park on September 9, 1946, when John Lord Booth, president of defendant, proposed a very complete and attractive building. During the following winter plaintiff drew various preliminary sketches of the proposed

building and delivered the first blueprints in February, 1947. To the Civilian Production Administration plaintiff estimated the cost of the building as $45,000, but it is claimed and not denied that this was at the request of Booth, who hoped a smaller building would be approved more readily.

Karl B. Foster, a general contractor, was contacted by Booth in March, 1947, relative to the construction of such a building which Foster thought at the time would cost at least $250,000. Preliminary work on the site began April 1st. In the meantime, work on the 2 Flint jobs had been begun and was concluded later in 1947. Their cost went far beyond the original estimates. After a certain number of conferences relative to the Highland Park building, the work was abandoned until June when CPA restrictions were lifted.

Early in July, 1947, public ground-breaking ceremonies took place at the site. Booth publicly stated that the building was to cost $100,000. After more preliminary plans and sketches, and on August 6, 1947, the written agreement was signed providing for 8% of final cost as plaintiff's fee. During August, 1947, both parties made a definite attempt to cut the cost of the proposed building. Plaintiff, Foster and Clark, the vice-president of defendant, met at Flint just prior to August 25th and Clark testified he stated there that the cost of such building could be no more than $55,000, or a simple transmitter building should be built instead. Plaintiff and Foster deny that costs were discussed at the meeting. On August 25, 1947, Booth requested that a substantial part of the proposed building, including the entire second floor, be omitted from future planning in an effort to cut final building costs. Obviously he expected the costs to be cut substantially by such extreme measures.

On September 4, 1947, Booth wrote plaintiff a

letter in which he directed further omissions and explicitly stated that the building was not to cost in excess of $52,500. Plaintiff replied on September 6th that no estimate of costs could be made until the plans were complete in detail. He consistently maintained this position until November, 1947, when the first bids were received, in the meantime, refusing to make any kind of statement as to what the costs of the project would be. The general contractor had not been notified of the maximum which had been set.

Construction planning meetings were called by defendant for September 10 and 12, 1947. On the 10th, requirements for the building were discussed and the preliminary plan, the so-called "Scheme G" was revised to "Scheme G-1" which was presented on September 12th and completely gone over with a view of cutting down the building to the minimum requirements. It is clear from the testimony that the emphasis during the meetings was on how little defendant could get along with. It is also clear that the materials, size and layout were finally dictated by Booth, who at the time was at least reasonably familiar with the costs of similar construction in Flint. Booth said he could not get along with less than the requirements in "Scheme G-1" even though he wanted to cut costs. He gave the final order to go ahead on "G-1" but did not mention the maximum cost at the meeting. He stated to Karl Foster, the contractor, plaintiff's witness,

"All right * * * that is what we have got to have. * * * Karl, it is up to you now to keep this cost down."

Immediately after the September 12th meeting, however, Booth called Foster outside the conference room and asked him how much the construction would be, saying, "Give me some idea, is it going to cost $100,000?" to which Foster answered that it

would cost that and more. Booth did not call off the work on receipt of this information. Foster testified, however, that Booth told him, "I better not" or words to that effect.

On September 15th the "G-1" sketches were revised to incorporate changes made at both meetings and delivered to Booth; and on September 16th, plaintiff wrote Booth that he was proceeding with complete plans and specifications in order to give him the cost estimates he desired. Final plans in accordance with "Scheme G-1" were completed by plaintiff on October 22, 1947. On October 18th, Booth had specified more omissions and stated that the building should not cost over $55,000 when completed, but on October 22d plaintiff replied that it was too late to incorporate the omissions in the plan and that the "scheme is based on your minimum requirements, and economical construction, and not on the basis of the cost mentioned in your letter."

On October 27th, Booth wrote to Foster that he had decided to delay construction until February 1, 1948, but again asked for estimates. Also, on or about October 27th, Booth was informed by Foster that the building would cost not less than $100,000, and Booth again made a remark to the effect that surely they would not build such an expensive building. Foster's information evidently inspired Booth's letter of October 28th in which he wrote plaintiff, asked for estimates, and stated, "In order for us to go through with this building, * * * it cannot cost more than $45,000," at the same time omitting more of his requirements. However, Foster testified that after the receipt of such letter there was a general meeting where everyone agreed it simply could not be done and Booth agreed to drop his cost requirements. Foster also stated that this was the first time he realized that Booth actually contemplated a cost of less than $100,000. In view of other

undisputed testimony, including Booth's letters, however, it seems highly unlikely that Booth gave any intimation that he expected the cost was to run to the high estimates which finally resulted, for he made it clear that he expected the cost to be much less.

Early in November, 1947, Foster prepared such cost estimates, amounting to $142,000 for the building and presented them to Booth. He testified that the reasonable cost of construction of the building would also be $142,000. This was almost 50% more than the $100,000 cost which had originally been contemplated by defendant, before the above-mentioned omissions. By November 5th, Booth decided not to proceed with construction and defendant requested that plaintiff and Foster plan and build a small transmitter building instead. Plaintiff had also been asked to make plans for a studio building on East Adams avenue in Detroit. Before he did any work on same, and on November 25th, Booth wrote him as follows:

"You disregarded the limits fixed by us as to the cost of the work. * * * You were advised of said limits before you performed any services under said contract. * * *

"We therefore consider our contract with you to have been breached by you and to be at an end."

The contract of August 6, 1947, is the standard one provided by the American Institute of Architects, similar to those used on the Flint jobs, and contains the following provision:

"Preliminary estimates.—When requested to do so the architect will furnish preliminary estimates on the cost of the work, but he does not guarantee the accuracy of such estimates."

It is the rule in Michigan that an architect must stay within the cost set by the owner, even though such cost was not set out in the written contract be-

tween the parties. See *Wetzel* v. *Roberts,* 296 Mich.
114. ˙ The first cost limitation set by defendant was
either at the disputed Flint meeting in the latter part
of August or by Booth's letter of September 4th.
Plaintiff, therefore, was clearly entitled to recover
something for his services rendered before the cost
limitation was set. Already on September 4, 1947,
Booth had written to plaintiff that the building was
not to cost in excess of $52,500 including contractor's
fee, but exclusive of the footings for the tower and
that was the figure "we should hold it to." While there
were further discussions largely with the view of
cutting down the expense of the building, plaintiff did
not give defendant any estimate of the cost, or refuse
to go ahead on the minimum cost set by defendant.

On October 18, 1947, defendant again wrote to
plaintiff ordering further omissions from the build-
ing and stating the building was not to cost over
$55,000. Plaintiff seemed unwilling to give any
estimate of cost until finished plans and specifica-
tions were submitted to contractor. Plaintiff frank-
ly testified in answer to the question propounded by
the judge that he could not give an estimate to de-
fendant as to whether the building would cost
$200,000 or $50,000. This certainly showed that he
was proceeding regardless of cost. It must be as-
sumed that as an architect he must have had some
idea of costs. There seems to have been some mis-
understanding between the parties, but plaintiff in-
sisted on going ahead when he had been warned and
had every reason to know that defendant had no idea
that the building would cost $142,000, the amount of
the bid that was received after plaintiff finished his
plans and specifications and long after he had been
told by defendant that the building should cost far
less than one-half the amount of the bid.

Applying the rule that plaintiff contends for in
regard to the payment of $6 an hour for preliminary

work prior to the contract, plaintiff's own statements show that he did charge at the rate of $6 an hour or $639 for 106½ hours for fees earned prior to entering into the contract in August, 1947, and defendant paid this amount as well as additional expenses. As late as September 12, 1947, plaintiff submitted a bill for the period from August 1, 1947, to September 1, 1947, in which he charged $39 for meetings and revision of sketches, and which defendant also paid. Plaintiff has therefore been reimbursed for all services rendered prior to the first cost limitation.

The trial court rejected all claims which plaintiff made for recovery on *quantum meruit* for a part or all of the work done after the first cost limitation was set. Plaintiff alleges that the cost limitation was waived after the September 12th meeting, but the facts do not indicate that such was the case, as elsewhere appears. Defendant received no benefit from work done during any of the time that plaintiff was proceeding to draw plans which could not be used by defendant contrary to defendant's instructions. Plaintiff having breached the contract as hereafter will be shown, and defendant receiving no benefit whatsoever from plaintiff's performance thereof after September 1st by reason of such breach, *quantum meruit* is not proper. Recovery cannot be had on a *quantum meruit* by a person who breached the contract against one receiving no benefit from the performance of the services for which recovery is sought. The trial court did not err.

The trial court also ruled that plaintiff had breached the contract and could recover nothing thereon by reason of his exceeding the cost limitation on the building. Plaintiff contends that the primary concern during the negotiations was plans and specifications, not cost; that Booth should have known that his requirements would result in a building far above the minimum he set; that his contract

absolves him from responsibility for cost estimates; and that defendant waived the maximum cost limitations both after the meeting on September 12th and at the meeting after October 28th.

The record, however, reveals that cost was an important factor all during the planning of the building; that plaintiff was aware that defendant would have to borrow money for the building and was concerned about rising costs on the Flint projects. As an architect, plaintiff possessed knowledge of building cost superior to that of defendant's officers. It was plaintiff's affirmative duty to give defendant some idea of the final cost of the project, regardless of whether defendant should have known of its possible cost or not. Plaintiff's contract did not absolve him from the duty of disclosure under these circumstances. As stated in 3 Am Jur, "Architects" on p 1000:

"The relationship between an architect, employed to furnish plans and superintend construction, and his employer, which is frequently characterized as an agency, is one of trust and confidence. Good faith and loyalty to his employer constitute a primary duty of the architect. *He is in duty bound to make full disclosure of all matters, of which he has knowledge, which it is desirable or important that his principal should learn.*" (Italics ours. Citing *Edward Barron Estate Co.* v. *Woodruff Co.,* 163 Cal 561 [126 P 351, 42 LRA NS 125]).

Although even if we assume defendant's officers may have waived the various minimum requirements set out by proceeding with the planning, and particularly after October 28, 1947, we do not believe this can be construed as a waiver of their right to object to plans for a building which would cost almost $100,000 more than the figures set by defendant. It is true that although Foster stated on 2 occasions previously that the building would cost $100,000 or

more, in each of these cases Booth made it quite
plain that he had no intention of building such an
expensive station; and at no time did plaintiff give
defendant any indication of what the real price
would be, but instead proceeded with plans despite
his knowledge that in any case his plans could not be
drawn to provide for a building to cost less than
$100,000. The whole course of planning indicated
that defendant contemplated a building costing far
less than $100,000; that the plans of July, 1947, from
which defendant had contemplated he would build
for $100,000, had been substantially cut so as to
provide for a much smaller size and immensely
cheapened in the kind of facilities and building ma-
terials to be used, and that defendant had expected
the price to be correspondingly lessened.

That in proper cases cost of construction may be
a condition precedent to recovery for architect's
services is shown by the annotation at 127 ALR 410:

"Architect's or engineer's compensation as affected
by inability to carry out plan or specifications at
amount satisfactory to employer."

The rule stated in 127 ALR on page 411, and
supported by a large number of citations, is as
follows:

"Where an architect is employed to prepare plans
for a building to cost not more than a certain sum,
or on condition that the building can be erected for
a certain sum, it has usually been held that the ar-
chitect is not entitled to compensation unless the
building can be erected for the stipulated amount."

See, also, 3 Am Jur, "Architects," § 15; *Wetzel* v.
*Roberts, supra,* and *Loyal Order of Moose, Adrian
Lodge 1034,* v. *Faulhaber,* 327 Mich 244.

Plaintiff relies on 127 ALR 415, citing *Clark* v.
*Smith,* 234 Wis 138 (290 NW 592, 127 ALR 406).
That case is authority for the proposition that where

plans are prepared according to details dictated by the owner, the owner is financially able to pay for the building planned, and the cost is not fixed in the agreement, and not mentioned until the plans are completed, the owner cannot object upon completion of the plans if the cost is more than he desired. It did not involve a situation where cost was a matter of concern to all parties from the inception of the planning, as we have here.

Counsel for plaintiff cite numerous other cases which we have carefully examined but which, also by reason of different factual situations, are not relevant here. The record here clearly indicates the desire of the defendant to cut the cost of the building far below the $100,000 contemplated to be paid in July, 1947, and indicates that plaintiff was fully cognizant of such purpose. There was a breach of the architect's duty to make full disclosure even if the maximum cost limitation set by defendant was waived, when without discussion, plaintiff proceeded to draw plans he knew would so far exceed defendant's ability and willingness to pay, and further that it was not even within the owner's contemplation to erect such an expensive building.

The trial court was therefore correct in denying plaintiff recovery for the value of his services or on his contract for the larger Highland Park building. Its judgment is affirmed.

*Small transmitter building.* Plaintiff alleges that complete plans were prepared for the small substitute transmitter building as of November 18, 1947; that the estimated cost of the planned building was $17,000; that the standard architect's fee in such case is 75% of 8% of the estimated cost of construction, or $765. Defendant, on the other hand, alleges that plaintiff was employed at the rate of $6 an hour to prepare sketches; that such sketches were adequate; but that plaintiff is entitled to nothing for

his plans as he had not prepared complete ones by the time the employment was terminated. No testimony as to the value of the plans actually prepared was introduced except that of plaintiff that his services were worth $765, and that of Clair W. Ditchy that 8% was a reasonable fee on the type of job involved.

Defendant introduced testimony that the cost of construction of the unit finally built was $13,254.84. As that building was based on a different set of plans, its cost is immaterial in determining the value of plans submitted by plaintiff.

The trial court held that as it was shown that plans were submitted before termination, and the only testimony thereof came from plaintiff, to the amount of $765, and that plaintiff was entitled to a judgment for that amount plus interest. Defendant alleges error.

There is no showing on the record that defendant has reimbursed plaintiff for any of his work on sketches or plans, either at the hourly or percentage rate. It also appears that plaintiff prepared whatever plans he did under direct orders from defendant.

As there was introduced no proof that the contract was on an hourly basis, as alleged, we must, therefore, assume that plaintiff on completing the plans would be entitled to $765. As the plans were substantially completed as contemplated, the trial court did not err in its determination.

Judgment affirmed. As neither party fully prevailed, no costs will be allowed.

NORTH, C. J., and DETHMERS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.