SHANNON *v.* POLISH FALCONS OF AMERICA, NEST NO. 86.

1. CONTRACTS—STEEL FABRICATION AND CONSTRUCTION—COST-PLUS CONTRACT.

Contract for purchase and erection of steel in 3-story building for defendant fraternal organization *held,* not a fixed-price, but a cost-plus, contract, where evidence shows that it was not based on a gross figure but that plaintiff was "to furnish and erect in place, on a cost-plus basis, such items as reinforcing rods, bar joist, structural steel, roof tee irons, and any other items of steel as agreed by the owners and architect * * * the seller will * * * have all items of cost indorsed by the owners and architect before any items are purchased * * * [and] will pay to the seller the cost of all items purchased, and cost of design and working drawings necessary to complete the work, as requested by the architect, plus 10% fee for the seller's services" without mentioning a maximum figure.

2. SAME — AMENDMENT — PAROL EVIDENCE — MISTAKE — FRAUD — DURESS.

An unambiguous written contract may not be amended by parol testimony of prior or contemporaneous agreements in the absence of mistake, fraud or duress.

3. SAME—MERGER OF PRIOR AND CONTEMPORANEOUS AGREEMENTS INTO WRITTEN CONTRACT—PAROL EVIDENCE.

A written contract merges all prior and contemporaneous negotiations in reference to the same subject, and the whole engagement of the parties and the extent and manner of their undertaking are embraced in the writing, in the absence of mistake,

REFERENCES FOR POINTS IN HEADNOTES

[2, 3] 12 Am Jur, Contracts § 428.
[3] 12 Am Jur, Contracts § 232.
[4] 12 Am Jur, Contracts § 234 *et seq.*
[8] 53 Am Jur, Trial § 123 *et seq.*

fraud or duress, hence, no prior or contemporaneous parol agreement tending to vary or contradict either its express provisions or its legal import can be considered in interpreting it.

4. SAME—PAROL EVIDENCE—STEEL CONSTRUCTION CONTRACT.

The allowance of parol evidence on the fixed-price versus cost-plus question in action for work and labor done and materials furnished under a steel fabricating and erection contract, apparently on the basis of a claimed ambiguity in the contract, merely raised, at most, a question of fact for the jury and its general verdict for plaintiff as to such issue was not against the great weight of the evidence.

5. SAME—STEEL CONSTRUCTION—MATERIAL CHANGE OF CONTRACT.

Evidence in steel construction contractor's action against fraternal organization *held*, not to sustain defendant's contention that plaintiff violated the terms of the contract by making material changes in either design or total requirements of steel without defendant's prior written authorization or on instruction of defendant's architect.

6. SAME—STEEL CONSTRUCTION—ARCHITECT.

The claimed shortcomings of defendant fraternal organization's architect may not be charged to plaintiff steel construction contractor in the absence of fraud or collusion between him and plaintiff with respect to action taken under the contract.

7. SAME—BREACH OF CONTRACT—STEEL CONSTRUCTION—EVIDENCE.

Finding that steel construction contractor had not breached its contract by failing to deliver and erect steel in accordance with contract terms *held*, not against the great weight of the evidence in action against fraternal organization, where circumstances were such as to raise a question as to defendant's ability to pay and defendant's written authorizations for freight and erection orders as required of it were not made and invoices were not paid.

8. TRIAL—REOPENING OF PROOFS—MITIGATION OF DAMAGES.

It was not error for trial court to reopen case to admit evidence pertaining to mitigation of damages after both sides had rested in action by steel construction contractor against fraternal organization, where proofs then adduced were identical to what plaintiff's counsel had recited in his opening statement, an amount substantially more than recited in plaintiff's pleading, since defendant was not taken by surprise, made no motion for continuance or mistrial and the evidence tended to reduce the sum claimed rather than raise it.

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted October 3, 1956. (Docket No. 28, Calendar No. 46,730.) Decided April 22, 1957. Rehearing denied June 10, 1957.

Action by Joe J. Shannon, Edward W. McDowell and John J. Lahey, copartners doing business as Macomber Detroit Sales, against Polish Falcons of America, Nest No. 86, a Michigan corporation, for sums due on contract for furnishing and erection of structural steel. Verdict and judgment for plaintiffs. Defendant appeals. Affirmed.

*John W. Babcock,* for plaintiff.

*Riseman, Lemke & Piotrowski (Harry Riseman,* of counsel), for defendant.

EDWARDS, J. Herein we relate the frustrations which met the effort of the Polish Falcons to build a nest.

This is a suit on a written contract for the furnishing and erection of the steel structure of a 3-story building. Plaintiffs and appellees were 3 partners doing business as Macomber Detroit Sales, whom we will subsequently refer to as Macomber. Defendant and appellant is the Polish Falcons of America, Nest No 86, a fraternal organization (hereafter the Falcons) which desired a new home for their lodge.

Macomber, after a jury trial, received a judgment for $51,171.30, from which the Falcons appeal.

The Falcons' building committee were all inexperienced in building construction. The Macomber partnership was experienced in the steel supply and erection business. Macomber prepared the written contract. The contract was to be executed in the fall of 1947 when testimony indicates structural steel was in short supply. We approach this lengthy record with these facts clearly in mind.

The Falcons, prior to August 27, 1947, employed J. Will Wilson, a registered architect, to plan and supervise the erection of a building. Three sets of plans were prepared by Wilson, one of which was finally acceptable to defendant. The approved set was submitted to plaintiffs, and negotiations were conducted thereunder resulting in the execution of a contract between plaintiffs and defendant on August 27, 1947.

The contract, drawn by plaintiff, provided in its pertinent portions as follows:

"1. This agreement * * * is an authorization for the seller to furnish and erect in place, on a cost-plus basis, such items as reinforcing rods, bar joist, structural steel, roof tee irons, and any other items of steel as agreed by the owners and architect to buy through the seller, for the completion of their new building to be located at E. Caniff and Klinger rd., Hamtramck, Michigan.

"2. It is agreed that the seller will purchase all materials at the lowest cost to meet the progress schedules, and have all items of cost indorsed by the owners and architect before any items are purchased.

"3. It is agreed that the owners will pay to the seller the cost of all items purchased, and cost of design and working drawings necessary to complete the work, as requested by the architect, plus 10% fee for the seller's services. * * *

"5. No change or alteration in the work hereunder shall be made except on the written order of the owners, which shall be signed by the owners, and countersigned by the architect. * * *

"9. It is further agreed between the owners and the seller that a weekly invoice for labor, material, and fees will be presented and will be payable within 5 days from date of invoice."

Plaintiffs referred the architectural plans they received to Richard McClurg, an engineer specializing

in structural design, who then prepared shop drawings for the erection of the steel structure. He observed that certain sections of the architectural drawings called for steel up to 70 inches in depth. This presented 2 problems: (1) steel mills ordinarily do not roll steel larger than 36 inches; and (2) a special order for 70-inch rolled steel would take 90–120 days to obtain delivery. The Falcons were unwilling to wait because they wanted to hold their national convention in the new building the following summer. Following consultation and consent of Mr. J. Will Wilson, Mr. McClurg prepared drawings for the use of "built-up" sections.

There was dispute at trial as to whether the building was improperly designed to use over 300 tons of steel, rather than 120 tons. The testimony of architect Wilson was that the Falcons wanted provision made for the possibility of the future addition of a roof garden. They also wanted a 14-alley bowling alley on the third floor, and a balcony on the second floor. Testimony indicated these changes accounted for much, or all, of the increased steel tonnage.

After plaintiffs had all the structural drawings prepared, along with the dimensions for each piece of steel, they were submitted to Mr. Wilson and the Falcons. Subsequently, Mr. Wilson and the Falcons signed purchase orders authorizing plaintiffs to obtain steel in accordance with the shop drawings. The undisputed testimony is that plaintiffs were able to purchase the required steel at 10¢ per pound, while the prevailing market price was 12¢.

On October 24, 1947, a meeting was held on the job site and attended by plaintiff McDowell, Argo Steel Construction Company (whom plaintiff had subcontracted to erect the steel), Arthur O. Misch Company (whom defendant had hired during October as general contractors), Mr. J. Will Wilson, and

defendant. It was there agreed that plaintiff would make certain alterations in the building as a result of the foundations having been improperly prepared (by parties not involved herein), and the Falcons' desire that the balcony be removed. The testimony allows a fair inference that this latter change was made because of the Falcons' concern about the mounting cost of the plans previously approved.

After October 24th plaintiff sent 9 invoices, dated from October 30, 1947, to January 5, 1948. None of these was paid by the Falcons.

Early in November Mr. Wilson resigned as architect, and in December the firm of Jensen & Keough was hired. In December a conference was held in Macomber's offices, at which time the new architects suggested further changes. Macomber asked authority to stop all shipments until such time as a final decision could be made regarding the building, but was told not to stop, that all changes could be made in the field, and that the Falcons had plenty of money to pay the costs. Macomber then prepared another set of shop drawings outlining the suggestions made by Jensen & Keough; these required less steel, but the provisions for the roof garden contemplated by the Wilson plans were deleted.

One of the plaintiffs, McDowell, testified that the attorney for the Falcons (also for the Liberty State Bank) who was assisting on the financing called him on December 31, 1947, and told him that "this job blew up," and that "the men haven't any money to build this job."

By this time the steel was already fabricated and beginning to arrive in Detroit. Plaintiffs sought instructions and authorization from defendant to deliver to the site and erect but, receiving none, removed the steel from the freight cars and stored it.

Plaintiffs sued for a net value of $80,263.70, after having deducted $5,233.31 as the scrap value of the

unused steel. After the close of testimony from both sides, but before the case went to the jury, plaintiffs introduced evidence of having recovered $30,231.59 from a sale of the steel in question.

The trial judge phrased the factual issues in this case in the following manner in his instruction to the jury:

"As I informed you, the plaintiffs contend that they entered into a contract with the defendant for it to furnish and erect in place, on a cost-plus basis, such items as reinforcing rods, bar joists, structural steel, roof T-irons, and any other items of steel as agreed by the owners and architect to buy through the seller, plaintiff, in this action, for the completion of their new building, to be located at East Caniff and Klinger avenues in the city of Hamtramck, this State.

"It is the claim of the plaintiffs that, in conformity with their contract with the defendant, they performed all of their requirements of that contract on their part to be performed. It is their contention that the defendant failed and neglected to live up to the terms of the contract entered into by and between the parties and to pay for the steel as it was delivered.

"It is the claim of the plaintiffs that they stopped the manufacture and fabrication of the steel by reason of the alleged breach by the defendants of their contract and that, at the time of the breach of the contract, plaintiffs had on hand certain steel fabricated for the account of the defendant which they sold to mitigate damages. The word 'mitigate' means to minimize damages and to reduce damages which the law requires when there is what may be termed a condition arising such as an impasse between the parties; then it is incumbent upon the party claiming the damages to do all within its power to mitigate its claim—in other words, to reduce its claim.

"Plaintiffs now seek at your hands damages for the balance they claim due them under and by virtue of the contract, exhibit 10 in this case.

"The defendant contends that, through its building committee, it hired an architect who proves to be J. Will Wilson and in turn contacted the plaintiffs for the manufacture and fabrication of the steel work necessary for the proposed building.

"It is the defendant's claim that the plaintiffs failed to abide by or live up to the terms of the written agreement between the parties in that plaintiffs failed to manufacture and fabricate the steel in accordance with the plans.

"They also claim that the plaintiffs failed to deliver the steel on order. They also claim that defendant was unable to use the steel manufactured and fabricated by the plaintiffs and that, although the defendant had paid the sum of $10,000 for said steel delivery, it was returned to the plaintiffs.

"Defendant further claims that it has established that the plaintiffs failed to perform under the terms of the contract in evidence, exhibit 10, in that the defendant was unable to use any of the steel manufactured and fabricated by the plaintiffs.

"Defendant further insists that it cancelled the contract because of the failure of the plaintiff to perform under its terms on or about December 26, 1947.

"Defendant claims that those plans prepared by the plaintiffs proved to be defective and that the plaintiffs did not repair those plans in such a manner as to fabricate, or have steel in conformity with, the plans for the building of their building on Caniff and Klinger.

"Also, the defendant insists that it is entitled to recover at your hands the sum of $10,000 heretofore paid by it to the plaintiffs.

"I think that, briefly and concisely, members of the jury, sums up the respective claims of the parties litigant. On the one hand, you have the claim of the plaintiffs that they performed all of the duties required of them under the contract, exhibit 10, and

that the fault lies with the defendant in not performing its part of the contract.

"On the part of the defendant you have the claim and assertion that the plaintiffs are to blame for what followed, and not the defendant, and, therefore, the defendant should be entitled to recover."

His charge concluded by instructing the jury generally to the effect that it could bring in a verdict for Macomber of any figure up to the sum of $52,171.30, or a verdict for the Falcons on their counterclaim of any figure up to $10,000, or a verdict of no cause for action.

Detailed requests to charge upon the issues of fact, referred to above, had been submitted by both parties. It is apparent from a comparison of these with the actual instructions of the court that the trial judge chose to use his own words. At the conclusion of the charge neither party objected to the instructions as to the issues of fact related above or as to the sums claimed by each.

The jury brought in a verdict of $51,171.30, which was subsequently entered as the judgment of the court after denial of defendant's motion for judgment *non obstante veredicto*. The trial court subsequently denied a motion for a new trial.

Defendant appeals. Its brief recites 14 "Statements of questions of law involved." In addition, the 14th such statement of questions of law involved relies by reference upon 18 added claims of error in the trial judge's failure to charge the jury in accordance with defendant's written requests to charge. Appellee responds to this situation with a complete rejection of appellant's claimed issues, and on his behalf presents an entirely different statement of facts and a counterstatement of questions involved totaling 15.

In the interest of both clarity and brevity we will attempt some regrouping and restatement of the problems thus presented.

### Issues of Fact

(1) Was this a cost-plus contract as contended by Macomber, or a fixed-price contract as contended by the Falcons?

(2) Did Macomber in the carrying out of the contract violate its terms by making material changes in either design or total requirement of steel without defendant's authorization?

(3) Did Macomber breach the contract by failing to deliver and erect the steel in accordance with contract terms?

(4) Did the Falcons breach the contract by failing to pay Macomber's invoices in accordance with contract terms?

In relation to these basic fact questions, appellant Falcon contends, and appellee Macomber denies:

(1) That there is no competent evidence in this record from which answers favorable to the plaintiff Macomber could have been found by the jury, hence appellant's motions for directed verdict or judgment *non obstante veredicto* should have been granted;

(2) That the trial judge failed properly to submit them to the jury in his charge, hence, that a new trial was warranted;

(3) That the answers to these questions favorable to appellee Macomber which may be implied from the jury verdict were against the great weight of the evidence, hence that a new trial was warranted.

In the above restatement we believe we have grouped the essential matter in appellant's questions 1, 2, 3, 4, 9, 10, 11, 12, 14, and appellee's counterquestions 1, 2, 3, 4, 10, 11, 12, 14, 15.

We will take these issues in order and answer the contentions of the parties in relation to each:

(1) Was this a cost-plus contract, or a fixed-price contract?

The written contract in question recited, in part, as follows:

"This agreement * * * is an authorization for the seller to furnish and erect in place, on a cost-plus basis, such items as reinforcing rods, bar joist, structural steel, roof tee irons, and any other items of steel as agreed by the owners and architect to buy through the seller, for the completion of their new building to be located at E. Caniff and Klinger rd., Hamtramck, Michigan."

Paragraph 3 further recited:

"It is agreed that the owners will pay to the seller the cost of all items purchased, and cost of design and working drawings necessary to complete the work, as requested by the architect, plus 10% fee for the seller's services."

Paragraph 2 of the contract provided the owners with an opportunity to observe and govern the costs which would flow from this contract:

"It is agreed that the seller will purchase all materials at the lowest cost to meet the progress schedules, and have all items of cost indorsed by the owners and architect before any items are purchased."

The Falcons in this appeal vehemently contend that representations as to the furnishing and erecting of the steel for the building at a cost of $55,000 to $60,000 were made, and that Macomber's failure to stay within that figure was the basic occasion for the ultimately disastrous results of this contract.

It is obvious from what has been recited above that the written contract was not based upon any such gross figure, and that it contained no reference

to any ceiling other than requiring prior approval by the Falcons before the steel was actually purchased. One of the Macomber partners, Mr. McDowell, testified at the trial:

"*A.* I do not know what appropriation—I have never heard what appropriation was set up for this building.

"*Q.* You want this court and the jury to understand that there at no time was any mention made as to what this thing was going to cost?

"*A.* No, I was never informed of that—only that they had plenty of money. I went out and got the prices, submitted it to their building committee, and they then approved, on top of my contract, every purchase I made and they knew exactly what I paid for it—every one of them.

"*Q.* Didn't you discuss with them the figure of $55,000?

"*A.* Never heard of that figure until today.

"*Q.* Didn't you discuss with them the figure of $60,000?

"*A.* Never did.

"*Q.* Told them the steel had gone up in price?

"*A.* No—come down, to be frank with you; I bought it cheaper than we estimated it would cost."

The closest to testimony pertaining to a fixed-price contract was that supplied by Mr. Hyso, the chairman of the Falcon's building committee:

"*Q.* I am asking you at this time what was said by the representatives of the Macomber people with respect to the financing?

"*A.* They just told us we should have $60,000 ready.

"*Q.* And did they say what that $60,000 represented?

"*A.* It would be for the steel that would be delivered.

"*Q.* They wanted $60,000?

"*A.* Yes. They just told us to have it ready when the steel comes in. I told them we were going down to our national headquarters to see if we could get that loan."

The conflict of oral testimony on this point was resolved by the jury in plaintiffs' favor. A review of it serves principally to remind us of the wisdom of requiring this sort of contract to be in writing.

Further, the contract-required documents of the Falcons' authorizations of the specific steel purchases and the prices therefor lend more weight to the jury verdict:

Exhibit B is an authorization dated September 16, 1947, for Macomber to purchase structural steel at 10¢ per pound;

Exhibit C represents an authorization dated September 30, 1947, to purchase bar joists and accessories and longspan joists and accessories for the sum of $19,602.35;

Exhibit D is an authorization dated September 30, 1947, to purchase reinforcing rod for the sum of $5.17 c.w.t.;

Exhibit E is a similar authorization dated October 7, 1947, for Macomber to purchase the "necessary self-centering lath for the subject job" for 7.5¢ per square foot.

These 4 separate authorizations were all subject to freight and erection charges, and were signed by the officers of defendant Falcons and witnessed by their architect to indicate his approval. In addition, 3 of these written authorizations included escalator clauses.

It is apparent from this record that the cost of the steel purchased and fabricated under these authorizations, plus shipping and engineering costs and Macomber's profit, represented very nearly the total of the invoices submitted to the Falcons and upon which this suit is based.

It is apparent from what has been said that none of the elements of a fixed-price contract was present in any written portion of this transaction. The contract and the written authorizations to purchase are clear, complete and unambiguous on the question of cost.

There is in this case no element of mistake or fraud or duress.

Under such circumstances, a written contract may not be amended by parol. Nor is parol evidence bearing upon such an amendment admissible.

"In the absence of mistake or fraud, a written contract merges all prior and contemporaneous negotiations in reference to the same subject, and the whole engagement of the parties and the extent and manner of their undertaking are embraced in the writing." 12 Am Jur, Contracts, § 232, p 756.

"No parol agreement prior to, or contemporaneous with, a written contract, which tends to vary or contradict either its express provisions or its legal import thereto, can be considered in interpreting it. A parol agreement inconsistent with a written agreement made contemporary therewith is void. Parol understandings, although they induce the making of a written contract, are merged in the writing so that they cannot be used to change the contract or show any intent different from that expressed in the instrument." 12 Am Jur, Contracts, § 233, p 757.

The trial judge, however, allowed parol evidence on the fixed-cost versus cost-plus question, apparently on the basis of an ambiguity in the contract, which we are unable to find. At best, this question became a question of fact for the jury, and its answer in the general verdict for Macomber as to this issue was not against the great weight of the evidence.

The second question detailed is: Did Macomber, in the carrying out of the contract, violate its terms

by making material changes in either design or total requirement of steel without defendant's authorization?

The answer to this question goes to the heart of the Falcons' case on appeal. The Falcons argue for an affirmative answer to the above question of fact. Assuming such an answer, they contend that, by making material changes in design or in total steel requirements, Macomber assumed the legal responsibilities in relation to overall costs which Michigan case law places on the architect. *Zannoth* v. *Booth Radio Stations, Inc.*, 333 Mich 233; annotation, 127 ALR 410. With the same assumption, the Falcons contend in the alternative that, by making material changes, Macomber became liable for the results of their changes, citing *Otto Misch Co.* v. *E. E. Davis Co.*, 241 Mich 285.

We find no quarrel with the legal principles called to our attention. But we cannot find that the great weight of evidence in this record requires an affirmative answer to this question of fact when the jury's answer was plainly negative.

We find no evidence of material deviation or change of plans on the part of Macomber, except where the testimony indicates without question that such deviation or change was either on the instruction of the architect or with prior approval in writing.

Thus the major item complained of, the total steel tonnage called for by Macomber's original shop drawings, was known to the architect and the Falcons prior to the signing by them of the written authorizations to purchase. Further, there is no competent testimony in this record to dispute Macomber's contention that the architect's original plans as furnished to them called for this amount and weight of steel.

There is no competent evidence either to support the Falcons' argument that Macomber's shop drawings invaded the architect's area of responsibility or represented substantial error. The contract called for Macomber to make "working drawings necessary to complete the work, as requested by the architect." No professional evidence indicates that they went beyond this responsibility and the architect, Wilson, certainly indicated the contrary. The only expert testimony introduced to attack Macomber's performance was that of a construction contractor, Salkowski, who testified that on his reading of the Macomber plans he found that various of the columns as designed in the shop drawings would fall below or above the levels required by the architect's plans. On cross-examination, however, he acknowledged that he was completely unaware of foundation errors which prior testimony indicated had compelled these deviations.

The Falcons' whole case on appeal is really predicated on the attempt to show that in some manner Macomber stepped into the architect's shoes and, hence, became responsible for the errors they allege the architect committed in improper and expensive design, in failing to advise his client on material matters as to over-all costs, and in failing to design a building within the figure they desired and were prepared to pay.

This argument falls on purely factual grounds. Wilson was employed by the Falcons—not by Macomber. He represented the Falcons and was their agent in dealing with Macomber. There is no evidence of fraud or collusion between Macomber and Wilson. The architect's shortcomings (and we note that these are alleged but not tried in this case since Wilson is not a party) may not be charged to Macomber.

Our third material question is: Did Macomber breach the contract by failing to deliver and erect the steel in accordance with contract terms?

It is undisputed that Macomber ordered, had fabricated and gave the Falcons notice of the arrival by freight car of the bulk of the structural steel contemplated for this building. The Falcons contend that they never gave Macomber any stop order and that it was his duty under the contract to deliver and erect the steel without any further authorization and before demanding payment.

The applicable contract provisions read:

"2. It is agreed that the seller will * * * have all items of cost indorsed by the owners and architect before any items are purchased. * * *

"9. It is further agreed between the owners and the seller that a weekly invoice for labor, material, and fees will be presented and will be payable within 5 days from date of invoice."

By December of 1947, when the fabricated steel began to arrive by freight car, Macomber had ample notice of the Falcons' concern about over-all cost of the building, and ample grounds to wonder about their ability to pay. At this point Macomber wanted assurance that payment would be available as the steel was delivered and sought written authorization for freight and erection orders. This latter was required of them by the contract. No such authorization was received. Nor were their prior invoices paid. The jury verdict, inasmuch as it represented a finding for Macomber as to this issue, was certainly not against the great weight of the evidence.

The last of our major questions is: Did the Falcons breach the contract by failing to pay Macomber's invoices in accordance with contract terms? About this there is no real factual dispute, the Falcons' argument being that their failure to pay is legally excused by answers favorable to them per-

taining to the questions above. The jury found for Macomber on this issue on the basis of competent evidence and a proper charge. The great weight of the evidence does not suggest new trial.

The balance of appellant's questions for review are less substantial. They pertain to trial court rulings on admissibility of evidence. We have reviewed the record pertaining to issues 6, 7, 8 and 13 and find either that the court was correct or well within his discretion under the total circumstances.

Appellant's question #5 questions the ruling of the court on Macomber's motion to reopen his case admitting evidence pertaining to mitigation of damages after both sides had rested as far as their main case was concerned. As to this matter, Macomber's pleading recited a lesser figure pertaining to the value of the steel left in Macomber's hands than they proved at trial. However, counsel for Macomber in his opening statement recited without objection the identical figures as to the sale of this steel which he ultimately proved by the disputed testimony. It does not appear that this evidence caught the Falcons by surprise. No motion for continuance or mistrial was made after the judge's ruling. The evidence tended to reduce the sum claimed rather than raise it.

We find no error in the trial judge's ruling on this point.

For the reasons stated, the judgment of the trial court is affirmed. Costs to appellees.

DETHMERS, C. J., and SHARPE, SMITH, KELLY, CARR, and BLACK, JJ., concurred.

VOELKER, J., took no part in the decision of this case.