IRVING KAUFMAN & another *vs.* LEITH L. LEARD & others.

Middlesex.   March 7, 1969. — June 5, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Contract*, Building contract. *Architect. Unjust Enrichment. Agency*,
  Scope of authority or employment, Architect. *Accounting. Equity
  Pleading and Practice*, Appeal.

An architect engaged by the owner of a house for a remodeling thereof was
  a general agent of the owner for that purpose, and contractors hired
  by the architect for the work were not bound by a limitation of cost
  imposed by instructions of the owner to the architect in the absence of
  anything putting the contractors on notice of such limitation on the
  architect's apparent authority.  [167–168]
On the facts, where the cost of remodeling a house greatly exceeded a
  maximum cost imposed by instructions of the owner to the architect
  and the owner was liable to the contractors engaged by the architect
  for the full amount of the contractors' charges, it was held that the
  architect was liable to the owner for the excess of cost over such maxi-
  mum, but that the architect would be entitled to an offset consisting
  of what, according to established standards of the architectural pro-
  fession, would be a reasonable margin of excess cost plus the architect's
  fee, up to the amount of increased value added to the house by the
  excess cost.  [170–171]
An architect engaged by the owner of a house for a remodeling thereof and
  liable to the owner by reason of cost incurred by the owner greatly in
  excess of a maximum cost imposed by the owner in instructions to the
  architect, upon paying the owner, would be entitled to take credit for
  an unpaid balance of his architectural fee.  [171]
An architect engaged by the owner of a house for a remodeling thereof
  had authority to hire a painter on a time and materials basis.  [172]
In a suit in equity under G. L. c. 214, § 3 (3), by the owner of a house
  against an architect and contractors engaged for a remodeling thereof,
  where the architect and one contractor appealed from a decree order-
  ing the owner to pay the contractors certain amounts even though
  they were greatly in excess of a maximum cost imposed by the owner
  in instructions to the architect, and ordering the architect to pay the
  owner a certain amount by reason of the excessive cost, it was held
  that if, upon a rehearing ordered, the amount due from the owner to
  the appellant contractor should be increased, a corresponding increase
  should be made in the amount to be paid by the architect to the owner
  notwithstanding that the owner had not appealed from the decree.
  [173]

BILL IN EQUITY filed in the Superior Court on October 24, 1962.

The suit was heard by *Kalus,* J., on a master's report.

*Carl M. Sapers* for Arthur H. Brooks, Jr.

*Sally A. Corwin* for E. J. Noel & Sons, Inc.

*Neil A. Cooper* (*Ralph B. Dunn* with him) for Leith L. Leard.

*George E. Lodgen* (*Geoffrey D. Wyler* with him) for the plaintiffs.

WHITTEMORE, J.  The plaintiffs (the Kaufmans) brought a bill in equity under G. L. c. 214, § 3 (3), so as to have disposed of in one proceeding the claims arising out of the remodeling in 1961 of their house at 147 Highland Avenue, Newton.  These included a pending action by the general contractor (the defendant Leith L. Leard), a pending suit by the painter (the defendant E. J. Noel & Sons, Inc. [Noel]), and the Kaufmans' claim against the architect (the defendant Arthur H. Brooks, Jr.).  Leard and Noel set up their claims in the Kaufmans' interpleader suit by way of counterclaim.  Brooks counterclaimed for an unpaid part of his architect's fee.  Leard's law action, Noel's bill to reach and apply against Leard and the Kaufmans, and the present suit were referred to an auditor-master.  The facts before us are set out in his report.

The master found that due to Brooks's fault the Kaufmans had come under an obligation to pay Leard and Noel more than the Kaufmans had authorized Brooks to contract for, that the Kaufmans should pay Leard and Noel the balances due them and that Brooks should pay the Kaufmans the excess costs above the authorized figure.

The following statement of the account between the Kaufmans and Brooks as cast by the master and reflected in the final decree indicates the basic findings of the report.

Total of Leard's charges to the Kaufmans on
   time and materials basis contracted for by
   Brooks                            $32,953.86

| | | |
|---|---|---|
| Total due from the Kaufmans to Noel as fair value of work contracted for by Brooks | | 7,000.00 |
| | | $39,953.86 |
| Limit of cost under the Kaufmans' authorization to Brooks | $17,000.00 | |
| Extras ordered by the Kaufmans | 5,415.00 | $22,415.00 |
| Kaufmans' excess liability to the contractors, unauthorized by them | | $17,538.86 |
| Part of architect's fee already paid | | 785.00 |
| | | $18,323.86 |
| Interest | | 5,900.28 |
| Par. 3 of final decree (Brooks to pay the Kaufmans) | | $24,224.14 |
| Plus costs | | 35.25 |

Paragraph 1 of the final decree ordered the Kaufmans to pay Leard a balance due of $25,136.40 ($32,953.86 less $7,817.46 paid on account) plus $9,232.60 interest, a total of $34,369. Paragraph 2 ordered the Kaufmans to pay Noel a balance due of $3,500 ($7,000 less $3,500 paid on account) plus interest of $1,284.85, a total of $4,784.85.

Brooks and Noel appealed from the interlocutory decree confirming the master's report and from the final decree. Noel also appealed from the denial of its motion to recommit and the failure to act on its motion to establish the truth of an affidavit.

1. *Brooks's Liability.* Brooks, beginning in 1954, had satisfactorily performed professional services for the Kaufmans. They bought the Highland Avenue house relying on his judgment that it could be adapted to their needs for a home and an office for Dr. Kaufman, a psychiatrist, within their stated budget of $12,000 to $15,000 for remodeling and redecorating. On plans inadequate for a firm bid, Brooks obtained an estimate from Leard of $15,100 exclusive of the

painting of old surfaces.  Brooks added $5,000 for this paint-
ing work and told the Kaufmans the work would cost
$20,000.  They told him that under no circumstances could
they or would they pay more than $15,000.  Changes were
discussed.  Brooks drew new plans and showed them to
Leard.  Leard said there would be a saving.  Brooks told
the Kaufmans that "by eliminating the painting and deco-
rating . . . the work could be done within their budget but
that by including the general painting at an estimated cost
of $3,000.00 and also doing some extra electrical work and
rewiring work which he had in mind . . . the entire cost
would be $17,000.00.  Dr. Kaufman said they wanted to
get the work started and to go ahead if the work would not
cost more than the $17,000.00."  Leard, on Brooks's au-
thorization, began work on August 11, 1961.  After Leard's
men had been at work two or three weeks, Leard's son, on
Brooks's request, recommended Noel, and Brooks asked him
to have Noel report on the job.  Noel's men came and Brooks
set them to work and thereafter usually told them where to
paint and what colors to use.

We conclude from the subsidiary facts that the Kaufmans
understood that the work had been authorized on the
basis of estimates.[1]  We conclude that because of the un-
certainties of such an arrangement the Kaufmans recog-
nized the possibility that they might be asked to pay bills
exceeding the $17,000 by some amount not disproportionate
to that figure.

The architect, because of his long and satisfactory relation-
ship with the Kaufmans, undoubtedly believed and an-
ticipated that under his detailed supervision and direction
a house would result that would be satisfactory to the

---

[1] On November 18, 1961, Kaufman, in a letter of protest to Brooks over
the mounting costs, wrote: "I am convinced that the total amounts . . .
are outrageous and should be brought down to something meaningful and
possible in relation to the original estimate. . . . If the agreement of a 12
to 15 thousand dollar expenditure had been written rather than verbal, any
expenditure above that ceiling would have been carefully reviewed according
to Mr. Leard."  In a letter to Brooks of December 12, 1961, Kaufman wrote,
"I am aware that more than $12,000.00 worth of work has been done.  How-
ever, before exceeding the original agreement, I want a ceiling on the cost
that bears some sensible and possible relationship to our original agreement."

Kaufmans and at a cost reasonably related to what in the light of results they would be willing and pleased to pay, even though it might exceed somewhat the $17,000 figure.

Unhappily, this was not the outcome and we think that the master was right in concluding that the responsibility is the architect's under this very risky and unsatisfactory arrangement. In the circumstances certain precautions to be taken by the architect were reasonably indicated. He should have made it emphatically plain to the Kaufmans that he could not be sure that the $17,000 figure would not be exceeded. His plans and specifications should have been sufficiently explicit for Leard to give a reasonably accurate estimate of cost. The architect should not have relied on his own estimate of probable painting expense. The conclusions of the master were that Brooks was negligent in failing to prepare adequate plans, in failing to submit written specifications to Leard, in failing to keep any record of the oral specifications given Leard, and in failing to tell the Kaufmans that he had only an estimate from Leard; also that Brooks exceeded his authority in ordering and directing work which he knew or should have known would cost in excess of the limit of $17,000. We discuss below the finding that Brooks violated his agent's obligation promptly to inform the Kaufmans of bills received in the course of the work in excess of the estimates.

We see nothing in the suggestion that Brooks was a special agent without authority to engage the contractors at a cost in excess of $17,000. Although he obviously was not a general agent for every activity of the Kaufmans, their instructions to him and his past dealings with them show that within the field of remodeling the house he had general authority. See *Alfred J. Silberstein, Inc.* v. *Nash,* 298 Mass. 170, 172–173. Compare *Marquandt* v. *Boston Young Women's Christian Assn.* 282 Mass. 28, 30–31. See also *Thalin* v. *Friden Calculating Mach. Co. Inc.* 338 Mass. 67, 70–71, and cases cited. Cases cited by Brooks are distinguishable. In *Leverone* v. *Arancio,* 179 Mass. 439, 442–443, a written contract specified that the architect would

be the agent to "direct" the work in accordance with specifications. It was held that this did not empower him to waive certain provisions of the building contract. *Harold L. Baker Co. Inc.* v. *Meledones,* 352 Mass. 485, 487, holds that the architect was without authority to bind the defendant to pay the contractor's debts to a subcontractor. Brooks's agency was subject to his principal's instructions as to cost limitation, but nothing put the contractors on notice that Brooks's apparent authority was so limited.

The master's report has inconsistent findings as to when the Kaufmans knew of the increased cost.[2] We agree with Brooks that it is a reasonable inference from finding No. 20 (set out in the margin) that Brooks and at least Dr. Kaufman discussed costs "greatly in excess of the estimate" about the middle of October or at least before October 25, 1961. As it was only on October 13 that Brooks had received bills in excess of $17,000,[3] he now argues that the finding is unjustified that he did not notify the Kaufmans as soon as he knew of excess costs. We see no need for recommittal because of

---

[2] "18. I find that all of the labor and materials supplied by Leard and Noel were with the approval and direction of Brooks who was on the job nearly every day supervising the work. I find that Brooks knew or should have known that work which he was authorizing and approved would cost a sum far in excess of the original estimate but at no time did he ever so notify the Kaufmans. Neither Doctor nor Mrs. Kaufman were familiar with remodeling costs and it was not until the work was substantially completed were they aware of the fact that the cost of the work done far exceeded the original estimate of $17,000.00. 19. Early in November of 1961 Mrs. Kaufman accompanied Leard, Sr. to Revere to select a refrigerator. At this time Leard told her that the costs were substantially in excess of his estimate and that the cost would run as high as $25,000.00. Mrs. Kaufman was shocked by this information and burst into tears. 20. When it became apparent to Brooks and the Kaufmans about the middle of October that the cost of the work was to be greatly in excess of the estimate, it was suggested that Kaufman could get an additional loan on the house from the holder of the mortgage. At Kaufman's request Brooks consulted with a Mr. Rogers of the bank and on October 25th, 1961 sent the following letter: . . . [the letter enclosed an outline of the work which concluded 'Estimate for the above work: $25,000.00']." The master's summary of evidence in response to Brooks's objections includes the statement: "The first time that the Kaufmans were told that the cost would be over $17,000.00 was when the defendant Leith L. Leard told Mrs. Kaufman early in November that his charges would be at least $25,000.00."

[3] September 12, 1961 (Leard, August 10 to September 6)          $5,817.46
    September 28, 1961 (Noel)                                        6,677.14
    October 13, 1961 (Leard, September 6 to September 29)            10,793.90

                                                       $23,288.50

the uncertainty as to just when after October 13 Brooks did inform the Kaufmans. The controlling finding is the reasonable one that Brooks ordered and directed work "which he knew or should have known would be in excess of the $17,000.00 budget."

The master also found that Brooks did not submit to the Kaufmans bills received from the contractors,[4] and he ruled that Brooks had a fiduciary obligation to do this. Brooks's liability does not depend on this finding and ruling. The master found that early in November the Kaufmans became so concerned about the cost of the work that they ordered all work to stop. Leard, at a conference on November 17, said that the costs amounted to $25,000 or $26,000. At Brooks's direction Dr. Kaufman then paid Leard and Noel each $2,000 and Brooks arranged to have Leard and Noel complete the work sufficiently so that the house would be livable. It is possible that if Noel's bill of September 28, 1961 ($6,677.14), and Leard's bill of October 13 ($10,793.90) had been sent to the Kaufmans upon receipt by Brooks, they would have stopped the work a few weeks earlier, and

---

[4] Noel's bills were as follows:

| | | |
|---|---|---:|
| 1. | September 28, 1961 | $6,677.14 |
| 2. | November 1, 1961 | 4,737.23 |
| 3. | November 28, 1961 | 1,957.01 |
| 4. | January 23, 1962 | 651.81 |
| | Total | $14,023.19 |

Brooks did not submit any of these bills to the Kaufmans. After the receipt of the bill of September 28, he submitted to Kaufman a requisition for a payment of $3,500 to Noel.

Leard's bills were as follows:

| | | |
|---|---|---:|
| 1. | September 12, 1961 (for work done August 10, 1961– September 6, 1961) | $5,817.46 |
| 2. | October 13, 1961 (for work done September 6, 1961– September 29, 1961) | 10,793.90 |
| 3. | November 17, 1961 (for work done October 2, 1961– October 31, 1961) | 13,542.47 |
| 4. | January 22, 1962 (final and recapitulation) | 2,345.08 |
| | Total | $32,498.91. |

Brooks sent only the first bill to Kaufman and did not notify him of the receipt of the others. On or about October 20, 1961, Brooks sent Kaufman a requisition for $6,500 in favor of Leard.

thereby saved some expense. This is speculative; Brooks is in any event responsible for the excess costs that have been proved.

We see nothing in Brooks's contention that Dr. Kaufman waived the $17,000 limit. His approval of the attempt in October to get an increased loan from the bank shows no more than recognition that the owners might have to pay to the contractors more than they had expected. Dr. Kaufman's payment of $100 to Brooks on December 12, 1961 (making the then total for services $785), accompanied a letter insisting that there be a ceiling on costs bearing "some sensible and possible relationship to . . . [the] original agreement." See fn. 1.

The report does not sustain Brooks's contention that the owners' changes, the delay in starting the work of two or three weeks to get a zoning variance and the effect of their moving into the house in mid-September so altered conditions as to relieve the architect from the responsibility otherwise his. There is no finding of the cost of the temporary kitchen on the second floor. It is not included in the architect's list of extras chargeable to the owner and there is no objection by Brooks addressed to it. The master expressly found that Mrs. Kaufman's messages requesting completion or repair of minor omissions or improper work were reasonable requests and would add very little to the cost.

Brooks contends that unjust enrichment of the Kaufmans will result if they may recover the difference between the amounts due the contractors and $22,415 ($17,000 plus $5,415 authorized extras). We agree that it is a reasonable conclusion that the Kaufmans have a more valuable and more attractive and desirable home than would have resulted from the expenditure of $22,415. Brooks cites two cases where the buildings were being built for investment and a rule was approved limiting recovery to an amount determined by subtracting from actual construction costs a figure arrived at by capitalizing the expected earnings of the building. *Edward Barron Estate Co.* v. *Woodruff Co.* 163 Cal. 561, 577–578. *Capitol Hotel Co. Inc.* v. *Rittenberry,*

41 S. W. 2d 697, 704 (Tex. Civ. App.) (case on demurrer). The difficulties of attempting to apply such a rule to the remodeling of this house for a home and office appear to us insuperable.[5]

It is entirely speculative what the Kaufmans would have done in August, September or October, 1961, if they had understood at an early stage that they could not possibly have what they wanted for $17,000, plus the cost of authorized extras.

We think it just, however, to have determined by expert testimony what, within the established standards of the architectural profession, is the reasonable margin of excess costs where an owner who knows he has no firm contract nevertheless has stated to his architect a fixed figure that is not to be exceeded, and where the architect has acted in all respects with due care to keep the expenditures within this figure. Such an offset is to be allowed to Brooks, if with the architect's fee (see below) it is not in excess of the increased value added to the house because of the excess expenditures.

We see no basis for depriving Brooks of his architect's fee, assuming he pays the Kaufmans what is due from him. His services contributed to the more valuable house that the Kaufmans have and which he must in part pay for. Hence, if and when the amount otherwise due from him to the Kaufmans is paid he may take credit for the balance of his fee.[6] See the *Kellogg* case, *supra* (157 Colo. at 302). The result would of course be quite otherwise if the owner were not getting reimbursement for the excess cost. See *Schwender* v. *Schrafft,* 246 Mass. 543, 545.

2. *Noel's claim.* The master found: "Noel claims to have been employed on a time and materials basis. I find

---

[5] Brooks refers also to *Kellogg* v. *Pizza Oven, Inc.* 157 Colo. 295, 301-302, where a tenant had been given a fixed allowance by the owner for renovation. Inasmuch as the tenant had to pay the full cost but did not own the structure he was not unjustly enriched and the court distinguished the *Capitol Hotel* case on this basis.

[6] His claim is for a balance of $1,215. If this is disputed, it must of course be determined on recommittal.

that there was never any discussion between Noel and Brooks which would be the basis of such an agreement." Following objections by Noel and a request for summaries of evidence, the master reported an agreement by all counsel that the findings set out in the margin [7] should be included in his report and that he "would have included . . . [these] findings . . . had . . . [he] understood that they were agreed to." We hold that the supplementary finding that "Brooks and Noel intended and understood that Noel was to do its work on a time and materials basis" is a part of the report (see *Budris* v. *New Amsterdam Cas. Co.* 292 Mass. 46, 50) and that it is inconsistent with the first finding in the report set out above. We hold, therefore, that Brooks had authority to engage the painter on a time and materials basis. A finding is justified that he did so and that the basis of compensation was sufficiently defined. *Cygan* v. *Megathlin*, 326 Mass. 732, 734. *Davidson* v. *Robie*, 345 Mass. 333, 337–339. Compare *Air Technology Corp.* v. *General Elec. Co.* 347 Mass. 613, 626–627.

We think, however, that there must be further findings. The master found that during the progress of the work "rapport between Brooks, Leard and Noel was not as it should be. Brooks frequently expressed dissatisfaction with the progress of the work. At Brooks' request the foremen for both Leard and Noel were removed from the job because of alleged inefficiency and lack of coordination. . . . [F]or a period of two weeks . . . Noel had seven to ten painters on the job every day and on many occasions it was necessary for one group of workmen or another to stop what they were doing to make way for another group." The master also found that charges by Noel for overhead, taxes, insurance

[7] "Noel did not know Brooks, or either of the Kaufmans. On previous transactions between Noel and Leard on which Leard asked Noel to do work, Noel billed Leard and Leard paid Noel. Brooks and Noel intended and understood that Noel was to do its work on a time and materials basis. Leard understood that Noel's work was on a time and materials basis. The details of Noel's time and materials basis were not discussed between Noel and Leard or Noel and Brooks. Noel was not requested to submit an estimated price and did not do so. Noel expended the amount claimed in its petition for materials and incurred labor costs, insurance and taxes as claimed in its petition."

and profit were computed on a basis substantially higher than Leard's.[8]

It is not clear beyond a doubt that even with the added findings the master would not have concluded that Noel's performance was such that it was entitled to recover only for the fair value of its work. Also, if Noel is to recover on a time and materials basis, there must be a determination of what are fair and reasonable surcharges for contractors' profit and overhead. Normally, of course, these are passed on by the architect in approving a bill for the owner. There is as to Noel no implicit finding by the master, as in the case of Leard, that the surcharges are reasonable.

3. If the amount found due from Kaufman to Noel is increased we hold that the amount due from Brooks to the Kaufmans is to be correspondingly increased even though the Kaufmans did not appeal from the final decree. The Kaufmans' bill in equity under G. L. c. 214, § 3 (3), asked for a determination of the rights of all the parties because of the multiplicity of interests. The final decree, in four separate paragraphs, determined (1) the Kaufmans' indebtedness to Leard; (2) their indebtedness to Noel; (3) Brooks's indebtedness to the Kaufmans; and (4) the dismissal of Brooks's counterclaim. Nevertheless the decree is an integral statement of the Kaufman-Brooks-contractors rights and obligations and we hold that in this statutory proceeding Noel's appeal in respect of paragraph 2 brought before this court the dependent issue of Brooks's liability declared in paragraph 3. The decree as modified will not be more favorable to the Kaufmans. See *Coe* v. *Coe*, 313 Mass. 232, 234.

4. The interlocutory decree denying Noel's motion to re-

---

[8] "Noel makes a charge of 18% of labor cost for unemployment taxes, Social Security and insurance, whereas Leard's similar charge was 10%. Noel makes a charge of 15% for overhead, of the total of labor, materials and the 18% charge for taxes and insurance, thereby computing percentage for overhead on the 18% for taxes and insurance. Leard makes a charge of 10% for overhead which 10% is computed only on materials and labor. Noel makes a charge of 10% for profit on the total of labor, materials, 18% for taxes and insurance, and 15% for overhead. Leard's 10% profit is computed only on the total of materials and labor."

commit is affirmed. The interlocutory decrees confirming the master's report and the final decree are reversed. The case is remanded for the findings and modification of findings required by this opinion.

*So ordered.*