659 So.2d 804 (1995)
J.B.N. MORRIS and Ben A. Seale
v.
Russell F. HAAS and J. Carlo Ditta.
No. 95-CA-75.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 1995.
Rehearing Denied September 18, 1995.
*805 Richard K. Leefe, Leefe, Gibbs & Koehler, Metairie, for plaintiffs/appellants.
D. Michael Dendy, Gretna, for defendant/appellee, J. Carlo Ditta.
Craig J. Cimo, Gretna, for defendant/appellee, Russell F. Haas.
Before KLIEBERT, GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
The plaintiffs, J.B.N. Morris and Ben A. Seale, bring this action against Russell F. Haas and Joseph C. Ditta for sums due on an indemnification agreement. The trial court found in favor of the defendants and dismissed the suit. For reasons that follow we reverse.
From joint stipulations and exhibits as well as testimony offered at trial, the following undisputed facts can be gleaned. In 1986 all plaintiffs and defendants herein were among eight investors who founded IBT Bancshares, Incorporated (IBT), a Louisiana banking corporation. IBT is a holding company, the principal assets of which are shares of Investors Bank & Trust (Investors), a Louisiana bank also founded by the same eight investors. On September 30, 1986, IBT entered into a loan agreement with Republic Bank of Dallas to borrow $2,554,702.50. The indebtedness was evidenced by a promissory note executed on the same day for the loan amount. The note was renewed in September, 1988 in the amount of $2,479,702.50. Republic Bank of Dallas closed and NCNB Texas National Bank (NCNB) became the holder of the note. All of the shares of stock in Investors, held by IBT were pledged as security on the loan.
All eight investors, including the plaintiffs and the defendants, were guarantors of the note. Each signed a limited guaranty in the *806 principal amount of $350,000.00. However, because the ownership of Investors was not equally divided eight ways, the parties entered into a Mutual and Reciprocal Indemnification Agreement which provided in part as follows:
WHEREAS, one of the conditions and requirements of the Loan Agreement between the Company (IBT) and the Bank (Republic Bank Dallas) is that each of the directors of Investors, individually and separately, execute and deliver to the Bank a personal guaranty in the sum of $350,000.00 on the Loan to the Company.
WHEREAS, the directors of Investors acknowledge that, since the percentage of direct and beneficial ownership of each and every one of them of the total stock of Investors issued and outstanding is not equal, a more equitable agreement and arrangement among themselves to share the financial responsibility of the personal guaranty of the Loan to the Company would be to share said responsibility among themselves based upon their proportionate share of ownership (direct and beneficial) of the shares of Investors Bank & Trust Company rather than to share said financial responsibility equally and by heads; provided, however, that portion of the Loan to the Company in excess of that required to pay the existing indebtedness of the directors of Investors and related parties, as aforesaid (hereinafter "Residual Debt"), and which consists primarily and substantially of the portion of the Loan being used to pay the indebtedness of the bank officers, as aforesaid, should be divided among them, equally, and by heads.
The agreement specifies, as it relates to the parties to this suit, that the plaintiffs, Mr. Morris and Mr. Seale each had a direct and related debt of $238,980.00, and an individual percentage of financial responsibility of 9.771. The agreement shows that the defendants had a higher degree of financial responsibility due to a higher ownership in the company. Specifically, Mr. Ditta had a direct and related debt of $443,730.00, and a percentage of financial responsibility of 17.785. Mr. Haas had a direct and related debt of $313,792.50, and a percentage of financial responsibility of 12.699.
The indemnification agreement also contains the following pertinent clause:
NOW, THEREFORE, the parties hereto, being all of the directors of Investors, do hereby covenant and agree that should the Company default on the payment of the Loan and should one or more of the parties hereto be called upon by the Bank (or other holder or holders of the Loan Note) to pay said Loan in whole or in part (hereinafter "amount paid") in an amount in excess of his individual percentage of financial responsibility for the payment of said Loan as hereinabove established and set forth (hereinafter "overpay" or "overpaid") then, in such event, each such party shall be reimbursed by each other party (who has not overpaid) said other party's respective individual percentage of financial responsibility of the proportion of the amount paid that the amount overpaid by such party bears to the total amount overpaid by all parties. Further, that any party who is required to and does pay the Bank by virtue of his guaranty agreement and/or who is required to and does pay any other party to and by virtue of this agreement does not and will not thereby waive his right of subrogation against and to be reimbursed by the Company for any and all of the amount so paid, which right(s) is hereby specifically reserved.
IBT made payments on the loan until 1990 when, as a result of an FDIC audit which showed a deteriorating loan portfolio, Investors was placed under a cease and desist order. That order prohibited Investors from paying dividends on its stock. Because IBT held Investors stock as its only asset, the company no longer had a source of income with which to make payments on the loan to NCNB. IBT defaulted on the loan and NCNB filed a suit on the note in federal court in Dallas against IBT and all eight guarantors.
The federal court ordered mediation which took place on June 11, 1991 in Dallas. After a full day of negotiation, the parties agreed to settle the lawsuit by entering into a formal settlement agreement by July 11, 1991. A *807 handwritten memorandum of settlement to that effect was executed by all parties or their representatives on June 11th. That handwritten memorandum dictated that the defendants were to pay to the plaintiff on July 11, 1991, the sum of $2,240,000.00. It further states that the guarantors in this case will receive the note endorsed without recourse and federal defenses, and will have their guaranties and the common stock of Investors returned to them. It further asserts that the suit will be dismissed with prejudice against the guarantors and without prejudice against IBT.
In the formal Release and Settlement Agreement executed one month later in accordance with the memorandum of settlement, there are some differences. In the formal agreement it is clear that only six of the eight guarantors paid the amount due NCNB under the settlement. The two guarantors who did not fund the payment due under the settlement are the defendants, Haas and Ditta. On July 8, 1991 the six investors who funded the settlement agreement entered into a joint venture for common ownership of the note to be transferred to them in the settlement agreement with NCNB in the Texas suit. As a result of the settlement, NCNB endorsed the note in accordance with the agreement, "pay to the order of, listing the six guarantors who funded the settlement. The note was transferred to those six guarantors.
The formal settlement agreement contains the three following clauses, not eluded to in the handwritten memorandum, which are relevant to the case at bar:
.....the guarantors who fund the payment identified in paragraph 1 of this Agreement shall be subrogated to NCNB's rights against IBT pursuant to La.Civ. Code Art. 3048.....
......
Provided however, nothing in this Agreement shall limit or otherwise affect the rights of the Guarantors who fund the payment identified in paragraph 1 of this Agreement against either IBT pursuant to La.Civ.Code Arts. 3049, 3050, 3052, or the rights of the guarantors inter se pursuant to La.Civ.Code Arts. 3055-57.
......
This Agreement shall be construed under and controlled by the laws of the State of Texas and this Agreement is fully performable in Dallas County, Texas, to the extent that this Agreement governs the obligations of the defendants to NCNB and the obligations of NCNB to Defendants, but this Agreement shall be construed under and controlled by the laws of the State of Louisiana and fully performable in the Parish of Jefferson, State of Louisiana, to the extent that this Agreement affects the obligations of IBT to the Guarantors and the rights and obligations among the Guarantors inter se.

All eight guarantors, including the defendants in the instant suit, signed both the memorandum and the formal settlement agreement.
Pursuant to the settlement agreement, an order of dismissal was signed by the federal district judge in the Texas suit on August 19, 1991 which dismissed NCNB's suit against all eight guarantors with prejudice, and against IBT without prejudice.
On December 31, 1991, all eight parties including the plaintiffs and defendants herein, entered into an Amendment to Loan Agreement which changes the principal amount and the payment terms for IBT. In that agreement which is signed by both defendants the following is stated:
WHEREAS, the Assignees, along with two (2) additional guarantors, Haas and Ditta, each executed Continuing Guaranties of the IBT debt in the amount of THREE HUNDRED FIFTY THOUSAND AND NO/100 ($350,000.00) DOLLARS;
WHEREAS, IBT defaulted on the Note and NCNB instituted litigation against IBT and all of the guarantors on the Note, the Assignees, along with Haas and Ditta, entered into a settlement of the litigation wherein the Assignees and Haas and Ditta purchased the promissory note of IBT to NCNB for and in consideration of the sum of TWO MILLION TWO HUNDRED *808 FORTY THOUSAND AND NO/100 DOLLARS ($2,240,000.00) DOLLARS and NCNB endorsed the Note to the order of Assignees:
WHEREAS, the Assignees purchased the Note from NCNB and reserved their rights against IBT, the original maker of the Note and the two (2) guarantors, Haas and Ditta, who were unable to fund their appropriate portion of the settlement agreement;
WHEREAS, the Assignees, as holders of the Note, wish to enter into an Amendment to the original Loan Agreement, dated as of September 30, 1986, by and between IBT Bancshares, Inc. and Republic Bank Dallas, National Association, to govern the terms and conditions of the repayment of the Note of IBT which Assignees now hold;....
The document continues on to alter the principal due on the note to reflect the new amount and to alter the terms of payment of that note.
Investors Bank and Trust Company was closed by the FDIC on November 13, 1992, and therefore made no payments on the note.
On May 27, 1992 two of the guarantors of the original note, Morris and Seale filled this suit against Haas and Ditta asserting that each plaintiff paid $332,671.06 to NCNB pursuant to the settlement agreement on the federal suit in Texas. They further allege that the amount paid by each was $113,808.32 in excess of that upon which he was obligated in accordance with the indemnification agreement. The petition seeks $47,412.55 for each plaintiff from Haas and $66,395.77 each from Ditta.
Defendants answered the suit asserting that no sums are due under the indemnification agreement because the note was purchased by the plaintiffs and therefore, no payment was made as guarantor. Thus, the defendants reason, the provisions of the indemnification agreement are not implicated in the transaction. Further, defendants assert their discharge from the indebtedness on the indemnification agreement by means of the settlement agreement and related order of dismissal in the Texas federal action. They also claim that certain actions subsequent to the dismissal preclude the plaintiffs from successfully bringing this lawsuit.
The matter went to a bench trial on August 30, 1994, and was taken under advisement. On November 2, 1994 the trial court rendered judgment in favor of defendants, dismissing the plaintiffs' demands at their cost. The trial court gave extensive written reasons for the judgment in which it found that the parties had entered into an agreement among themselves to settle the Texas law suit and dismiss Haas and Ditta; that the dismissal with prejudice was res judicata, relieving the defendants of any further liability as guarantors. Alternatively, the court found that the indemnification agreement was not applicable because the plaintiffs had purchased, rather than paid the note; and that the purchasers of the note had subsequently altered the terms of the debt without the consent of the defendants, thereby releasing them as sureties.
On appeal plaintiffs/appellants assign five errors which can be condensed into four arguments: the trial court erred in finding that the indemnification agreement did not apply in the purchase of the note; that the plaintiffs' rights under the indemnification agreement did not survive the Texas suit; that the defendants did not consent to the alteration of the debt after the purchase of the note; and in allowing the introduction of an "offering circular" into evidence.
At trial plaintiff, Ben Seale, testified that he thought the settlement had no impact on the indemnification agreement. He stated that the agreement among the parties was that the indemnification agreement was "in place and would stay in place" even after the settlement of the Texas suit. Mr. Seale explained that on June 11, 1991 when the settlement was reached, it was agreed that all guarantors, including Haas and Ditta, would pay the $2.24 million by July 11, 1991 to settle the suit. He stated that much discussion took place between the time the memorandum of settlement was written on June 11th and the actual payment due date of July 11th. It was during that time that the defendants refused to pay their share on the note. There was much discussion and concern that *809 the guarantors would not be able to meet their obligation under the settlement agreement if all of the parties did not pay their share. Mr. Seale stated that he realized if the July 11th deadline was not met, the loan would be called in and the Investors stock which secured the loan would be taken by NCNB. Therefore, the parties reached the ultimate settlement agreement which was reflected in the formal agreement in which the clauses were added to reserve the rights of the six guarantors who funded the agreement against the two who did not.
Defendant, Russell Haas, testified that he had been in the banking industry since 1955, having worked his way up from a posting bookkeeper to president of Guaranty Bank & Trust. He left Guaranty to organize Investors. He was the president and a director of Investors, and served on the board of directors of IBT. He resigned his positions with Investors, as well as IBT, on March 15, 1991 after discussions with his family and the FDIC.
It was Mr. Haas who arranged the loan with Republic Bank of Dallas; and he testified that he was aware of certain defenses to the suit on the note Investors may have.
He further testified that he made it known before the mediation in Dallas that he would not be able to met his commitment on the guaranty. He denied any suggestion that he agreed to help fund the agreement on June 11th. He also knew that Mr. Ditta would be unable to meet his obligation. He stated that he understood when he signed the agreement on June 11th that the note would be assigned only to the six guarantors who eventually funded the settlement, and that he and Mr. Ditta would not be included. Mr. Haas stated that the formal agreement executed one month after the original hand written memorandum constituted an agreement among the six who funded the agreement. He indicates that he felt the term "guarantors" in the reservation of rights clauses of the settlement agreement referred to the guarantors who actually funded the agreement. Mr. Haas was vague in his testimony concerning when the term "guarantors" referred to him, but he was certain he was included in the dismissal with prejudice from the Texas suit. He stated that when he left the mediation on June 11th, he was out of the suit. Nonetheless, he admits he signed all of the documents entered into evidence and previously referenced herein including the June 11th memorandum of settlement, and the July 11th formal agreement containing the reservation of rights clauses.
It is Mr. Haas' position that when the six investors bought the note on the settlement, they lost any rights they previously had against him because the note came to them without a guarantor. He states that he was quite concerned about his liability on the guaranty and believed the purchase of the note, rather than the payment of it, was determinative of his release on the guaranty.
Defendant, Joseph C. Ditta, testified that all of the other guarantors knew before the Dallas mediation meeting that he would be unable to fund his part of the guaranty. He stated that he originally owned 17.785% of the stock of Investors, but had to surrender most of it because he was unable to meet his obligation under the guaranty. At the time of the meeting in Dallas he owned only about 1% of the stock. He testified that after the June 11th handwritten memorandum was executed, he was released from all liability. He said he was unaware of the joint venture agreement signed by the six funding guarantors until the trial. When questioned about the meaning of the memorandum agreement he signed on June 11th, he agreed that it stated that "the guarantors in the case will receive the note", but said that, at the time, he only looked at the part which said they would be released without prejudice. On cross-examination Mr. Ditta agreed that the memorandum stated that the "defendants" would pay the settlement. But he understood that to be a general term, not including himself, Mr. Haas or IBT.

LAW
The first question to be considered by this Court is whether the indemnification agreement used as a basis for this lawsuit survived the Texas federal action. In their answers to the petition which instituted the instant suit, both defendants raised the issue of res judicata. They maintain, and the trial *810 court held, that the dismissal of NCNB's action against them in federal court constitutes a bar to the present suit. We do not agree.
The law of res judicata is set forth in LSA-R.S. 13:4231 as amended effective January 1, 1991 and reads in part as follows:
Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment. (emphasis added)
The amendment constitutes a substantial change in the law. As explained in the comments, under prior law the interpretation of res judicata was narrow, barring an action only when the plaintiff sought the same relief based on the same cause or grounds. To foster judicial economy and to protect the defendant from multiple law suits, the new law bars an action because it arises out of the same transaction or occurrence which was the subject matter of the prior litigation. In accordance with this new rule, LSA-C.C.P. art. 1061 has been amended to require a defendant to, "assert in a reconventional demand all causes of action that he may have against the plaintiff that arise out of the transaction or occurrence that is the subject matter of the principal action". (emphasis added) We find nothing in the new law on res judicata to suggest that identity of parties is no longer required for a bar of the second action.
Identity of parties does not mean the parties must be the same physical or material parties, but they must appear in the suit in the same quality or capacity. Charles E. McDonald Land Development Inc. v. Cashio, 552 So.2d 1050 (La.App. 1st Cir.1989); Greer v. State, 616 So.2d 811 (La.App. 2 Cir.1993). The parties in the instant suit, while all included in the federal suit, appeared in different capacities. The original plaintiff, NCNB is not a party to the second suit. The instant suit is an action brought by two of the defendants in the original suit against two other original defendants for indemnification.
Further, we note that all parties to the second suit signed both the handwritten memorandum of settlement which states the guarantors will pay the settlement, as well as the formal settlement agreement which states that only six of the eight investors will fund the agreement and specifically preserves the rights of the guarantors inter se. All parties to the second suit were guarantors in the first suit. Therefore, we conclude that the trial court erred in its decision that the instant action is barred by the dismissal of the defendants in the federal suit. We also conclude that, by agreement of all parties, the indemnification agreement survived the dismissal of the federal suit.
The trial court found that, because the six guarantors purchased, rather than paid the note in settlement of the federal law suit, the indemnification agreement did not apply. We do not agree.
The Mutual and Reciprocal Indemnification Agreement is a valid contract and it forms the law between the parties. LSA-C.C. art. 1983; Williams Engineering, Inc. v. Goodyear, 496 So.2d 1012 (La.1986). Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046.
The provisions of a contract are to be interpreted to give them effect. LSA-C.C. art. 2049; Maier v. CMS & Associates, Inc., 601 So.2d 724 (La.App. 5 Cir.1992) writ den. 605 So.2d 1148 (La.1992). Words susceptible of different meaning must be interpreted as having the meaning that best conforms to the object of the contract. LSA-C.C. art. 2048; McCrory v. Terminix Service Co. Inc., 609 So.2d 883 (La.App. 4 Cir.1992). The contract as a whole must be considered in interpreting each provision. LSA-C.C. art. 2050; Maier v. CMS and Associates, supra.
*811 The rule of strict construction does not authorize the trial court to create an ambiguity where none exists by the exercise of inventive powers or a perversion of language. Further, the court may not make a new contract for the parties when the contract is expressed with sufficient clearness to convey the plain meaning of the parties. Massachusetts Mutual Life Ins. Co., v. Nails, 549 So.2d 826 (La.1989); Weeks v. T.L. James & Co., 626 So.2d 420 (La.App. 3 Cir. 420 1993)
The trial court's inquiry should have been whether the words of the indemnification agreement clearly set forth the intent of the parties. Whether a contract is ambiguous is a question of law. Weeks v. T.L. James & Co., Inc., supra. In such matters appellate review is simply whether the trial court was legally correct or legally incorrect. Because the ruling of the trial court is not based on any factual finding, this court is not bound by the manifest error rule of appellate review. Weeks v. T.L. James & Co. Inc., supra.
In applying those principles to the indemnification agreement we find that by its terms, that agreement was intended to provide a recourse for those guarantors who, upon default of the original loan, pay all or part of the obligation, against those guarantors who do not pay. Further, those who pay upon default because of their guaranty, retain a right of subrogation against IBT by virtue of the indemnification agreement.
While the fact that the plaintiffs received the note upon payment may make a difference in the rights they acquired from the original holder pursuant to negotiable instruments law, it is of no consequence for the purposes of their rights under the indemnification agreement. We believe the distinction between the cancellation of the note and the transference of it, for the limited purposes of assigning rights under the indemnification agreement, is a distinction without a difference. It is clear that when the parties entered into the agreement they intended to protect each other from exactly what happened in this case; an instance when some of the guarantors would have to pay all of the sums due on default. The agreement reserved their rights to collect from each other and/or IBT in that event.
This interpretation of the indemnification agreement is consistent with the general law of suretyship embodied in LSA-C.C. art. 3055 et seq., which rights were reserved to the paying guarantors, by all eight guarantors including the defendants herein, in the settlement agreement in the federal suit. When one guarantor "paid or otherwise discharged the debts", that guarantor has his remedy against each of the other sureties for each surety's proportionate share of the amount paid. Aiavolasiti v. Versailles Gardens Land Dev. Co., 371 So.2d 755 (La.1979). The Supreme Court in Aiavolasiti distinguished the rights of one, of several guarantors, who discharges a debt against the principal debtor from those against the co-sureties. A continuing guarantor, who discharges the principal debt he and others guarantee, and is conventionally subrogated to all rights of the creditor bank, may not sue his co-sureties on the note. His relationship with the other guarantors remains that of co-surety. Aiavolasiti, supra.; Koeniger v. Lentz, 462 So.2d 228 (La.App. 4 Cir.1984). Whether the note was discharged or purchased when Seale and Morris paid the settlement, is of no moment in their relationship with Haas and Ditta. That fact only effects the rights of the funding guarantors against the principal debtor, IBT. The guarantors remain co-sureties in so far as their relationship to each other and the indemnification agreement provides a contract by the parties governing how those obligations are to be fulfilled.
The trial court found alternatively that subsequent actions by the plaintiffs, in which they changed the terms of the note, relieved the defendants of liability. The trial court found that the defendants did not consent to the changes, and were released under the law of surety which holds that any modification of the principal obligation, without the surety's consent, releases the surety.
Because we find that the defendants did, in fact, consent to the changes made in the debt as evidenced by their signatures on the document which made those *812 changes, as well as their testimony at trial, we find this to be a manifestly erroneous ruling by the trial court. It is the constitutional duty of this Court to review facts. Ambrose v. New Orleans Police Amb. Sev., 639 So.2d 216 (La.1994). When, as in the instant case, the factual finding of the trial court is clearly wrong based on the evidence presented, this court must upset the finding. Ambrose, supra.
The plaintiffs also complain that the trial court erred in the admission into evidence of an offering circular of IBT. Their argument is that the document is hearsay. We find no merit in this argument. The circular was authenticated by Mr. Seale, who was on the board of directors of IBT.

DAMAGES
The indemnification agreement states that in the event some of the guarantors pay more than their share, reimbursement shall be made according to the following formula:
(E)ach such party shall be reimbursed by each other party (who has not overpaid) said other party's respective individual percentage of financial responsibility of the proportion of the amount paid that the amount overpaid by such party bears to the total amount overpaid by all parties.
Thus, we do not necessarily agree with plaintiffs' contention that they are entitled to all of their overpayment from the defendants. By the terms of the agreement the plaintiffs are due reimbursement in proportion of the amount they overpaid to the total amount overpaid by all parties. It seems likely that other guarantors, not parties to this suit, may have paid more than their share. That information is necessary to the accurate assessment of damages and is not contained in this record.
For the reasons herein stated, we reverse the trial court's judgment and remand the matter for an assessment of damages.
REVERSED AND REMANDED.